IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-CR-139-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ) | |
| CARLOS EDGAR SANDOVAL-URIEL, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress Evidence; Supporting Memorandum Of Law" (Document No. 90) filed June 12, 2012. The United States filed its "Government's Opposition to Defendant Sandoval-Uriel's Motion to Suppress" (Document No. 96) on June 18, 2012. Defendant then filed his "Supplement to Motion to Suppress Evidence" (Document No. 219) on April 21, 2013. The "Government's Response to Defendant's Supplement Motion to Suppress" (Document No. 220) was filed on April 23, 2013, and the "Government's Second Supplement to Response To Defendant's Supplement Motion to Suppress" (Document No. 226) was filed on May 5, 2013. An evidentiary hearing was held before the undersigned in two installments on April 29, 2013 and May 16, 2013, with Defendant personally present with counsel. Having carefully considered the briefs, testimony, evidence, and oral arguments, the undersigned will respectfully recommend that Defendant's motions be denied.

**I. FACTUAL BACKGROUND**

On April 18, 2012, a "Bill of Indictment" (Document No. 1) was filed charging

Defendant Carlos Edgar Sandoval-Uriel ("Defendant" or "Sandoval-Uriel") with knowingly and intentionally conspiring with other persons to distribute, and to possess with intent to distribute, a mixture and substance containing a detectable amount of marijuana; and with knowingly and intentionally possessing with the intent to distribute a controlled substance, that is, a mixture and substance containing a detectable amount of marijuana, both violations of Title 21 of the United States Code. Subsequently, on June 16, 2012, Sandoval-Uriel moved to suppress evidence seized during and after his arrest. (Document No. 90). The briefs and the arguments, testimony, and evidence submitted at the hearing on the motion to suppress on April 29, 2013 and May 16, 2013, established the following pertinent facts, which are largely undisputed:

On April 2, 2012, Customs and Protection agents stopped a truck hauling three large pieces of cultivating equipment at the Laredo, Texas border crossing. The use of X-ray equipment, drilling tools, and a narcotics detection dog led to the discovery of an enormous amount of marijuana hidden inside the equipment. On April 3, 2012, a consensually monitored phone call was made through the shipping company to the consignee, whose phone number had a Charlotte area code. This call confirmed that the load was to be delivered to 592 Griffith Road, Charlotte, North Carolina ("592 Griffith"). On April 6, 2012, Homeland Security Investigations ("HSI") agents escorted the truck carrying the cultivating equipment and marijuana to Charlotte, arriving on April 8, 2012.

Beginning on April 3, 2012, and continuing until the arrest of Sandoval-Uriel on April 17, 2012, agents maintained 24-hour surveillance of 592 Griffith. On April 8, 2012, agents first saw Victor Guerra ("Guerra") at 592 Griffith. On April 9, 2012, with the aid of HSI agents, the equipment was delivered to Guerra and Paul Ayala ("Ayala") at 592 Griffith. The

agents then saw Guerra and Ayala leave the area in a 2003 white, Ford Econoline van ("white van") with North Carolina license plate AKX6371. From the delivery date on April 9, 2012, through April 17, 2012, Guerra and Ayala made multiple trips in the white van from 592 Griffith to their hotel, the La Casa Inn, at 7900 Nations Ford Road.[1] At various times, agents witnessed Guerra locking and unlocking the door at 592 Griffith. On April 13, 2012, Guerra and Ayala rented a piece of heavy moving equipment that was dropped off at 592 Griffith, and Guerra parked a large flatbed truck at 592 Griffith.

On the afternoon of April 13, 2012, Guerra and Ayala drove the white van to Stonecrest Shopping Center ("Stonecrest"), where they parked beside a blue Toyota Camry ("blue Camry"). Agent Brandon Brewer ("Brewer") testified that he was parked directly in front of the blue Camry in the Stonecrest parking lot, with the front of his car facing directly toward the front of the blue Camry. Brewer and several other agents in the surrounding area witnessed Guerra and Ayala get into the blue Camry (as passengers), drive out of the Stonecrest parking lot, and proceed to drive approximately 24 miles one way to Monroe, North Carolina and then back. At that time, the agents did not know whether the blue Camry made any stops (agents lost the blue Camry for a short time as the car arrived in the Monroe area). Brewer stated that the blue Camry driver's driving techniques were indicative of someone trying to "detect or evade law enforcement." He stated that the driver would frequently increase and decrease his speed and change lanes.

After the blue Camry returned to Stonecrest and dropped Guerra and Ayala off, the blue Camry proceeded to a park off Johnston Road in Charlotte, where the driver apparently went

---

[1] It is important to note that both Guerra and Ayala had Texas driver's licenses; this was known to agents prior to Defendant Sandoval-Uriel's arrest because in an unrelated matter, Guerra and Ayala provided law enforcement officers with their Texas biographical information as well as with their cell phone numbers, which had Texas area codes.

3

for a run. Afterward, agents followed the blue Camry to Providence Road, where the driver made a turn onto Allison Woods Drive and then a left onto Allison Lane (both herein referred to as the "Allison Woods area"). Upon entering the development, Brewer stated that the driver would speed up and slow down, a common counter-surveillance tactic. In this area, Brewer and other agents lost sight of the driver of the blue Camry. From April 13, 2012 through Defendant's arrest on April 17, 2012, agents never identified the specific residence of the blue Camry's driver; however, after the arrest, agents identified Defendant's residence as 12140 Red Rest Lane, Charlotte, which is accessed from the Allison Woods area.

On April 13, 2012, after an hour or more of waiting for the blue Camry to re-appear, the agents saw the blue Camry leaving the Allison Woods area, and they followed the driver to "Skinnyz Bar and Grill" ("Skinnyz"), located in Matthews, NC. Inside the bar, Agent Brewer surreptitiously took a picture of the driver of the blue Camry. Brewer testified at the hearing that the person in the picture, identified as Exhibit 6 at the hearing, is the same person who was driving the blue Camry on April 13, 2012, and he testified that this was the same person sitting in the courtroom, Defendant Sandoval-Uriel.[2] Brewer left the bar before Sandoval-Uriel and went back to the Allison Woods area in an attempt to locate where the driver of the blue Camry lived. When Brewer saw the blue Camry return, Brewer turned and followed behind the blue Camry, which made numerous turns. Due to the driving tactics employed by the blue Camry's driver, Brewer testified that he "did not feel comfortable" and stopped following. Agent Brad Myers ("Myers") also testified to the unusual nature of the blue Camry's movements. He stated that when the driver of the blue Camry appeared to notice a car following him, the driver pulled to the curb; and when Myers passed him, the blue Camry

---

[2] Agent Brad Myers also testified that the driver of the blue Camry on April 13, 2012 was the same driver that appeared at Skinnyz and identified Defendant Sandoval-Uriel in court as the same person seen in the Camry on April 13, 2012.

4

pulled out behind the Agent. At that point, Myers signaled right at the stop sign and the blue Camry proceeded left. This was the last Myers saw of the blue Camry on April 13, 2012.

On April 16, 2012, agents witnessed Guerra and Ayala move one of the pieces of the marijuana-containing cultivating equipment from 592 Griffith to 658 Griffith Road, Suite 115 ("658 Griffith"). 658 Griffith appeared to be an auto body shop. The equipment was later pulled inside the shop, and the door closed. Later that day, two individuals entered 658 Griffith with welding equipment. Agents then entered an establishment beside the adjoining shop and heard loud sounds and smelled burning marijuana. Persons at the business beside the shop also complained to the agents of the strong smell of burning marijuana.

Also, later on April 16, 2012, agents saw the driver of the blue Camry meet with the driver of a white Toyota Camry ("white Camry") at Stonecrest parking lot. Agents could not identify the driver of the blue Camry at that time. However, the driver of the white Camry was identified as Jose Luis Sandoval-Godoy ("Sandoval-Godoy"), who was also the registered owner of the blue Camry. Prior to this meeting, agents also saw the white Camry at 658 Griffith the day the equipment was moved, burning marijuana was smelled, and the loud noises were heard. That evening, the white Camry drove Guerra, Ayala and two other men from Griffith Road to the hotel where they had been staying.

On the morning of April 17, 2012, Myers witnessed the blue Camry leave the Allison Woods area and turn right onto Providence Road and head towards Interstate 485. Myers and Agent Glenn McDonald ("McDonald") witnessed the driver make a "long loop" around the Tyvola Road/Nations Ford Road area for no apparent reason, and then continue onto Interstate 77 towards North Charlotte. Agent James Bryant ("Bryant"), who was parked off Mineral Springs Road, witnessed the driver of the blue Camry drive down Mineral Springs Road and

pull into the parking lot of an "elderly home," never getting out of his car.

Also on the morning of April 17, 2012, agents witnessed the white van drive into a business bay door at 658 Griffith; the door then closed. Later that morning, the door opened back up, and the van left 658 Griffith and headed to what later was revealed as a marijuana stash house located at 7136 Amarillo Drive, Charlotte, North Carolina ("Amarillo Drive"). Amarillo Drive can only be accessed by car from Mineral Springs Road.

Bryant witnessed the blue Camry pull back onto Mineral Springs Road after the white van passed the "elderly home" (two agents in vehicles separated the white van and the blue Camry). When the white van slowed to turn left onto Amarillo Drive, the agents also turned left to follow, and the blue Camry continued straight down Mineral Springs Road. Bryant testified that before the blue Camry continued straight he had braked, "indicated that he was turning left," appeared "hesitant" and looked in the mirror several times. Myers and McDonald also witnessed the blue Camry following two cars behind the white van brake when the van turned left, but then continue down Mineral Springs Road.

Bryant testified that after this series of events, he was told to stop and arrest the driver of the blue Camry, now identified as Defendant Sandoval-Uriel, which he did. Incident to arrest, agents seized a receipt for cans of paint found in the body shop at 658 Griffith, a business card listing Defendant as sales representative for "Truck & Auto Motor Company," the name of the shop located at 658 Griffith, and a garage door opener. The agents later used the garage door opener to locate Defendant's house and to seize certain belongings inside, including: a money counter; $192,730 in U.S. Currency in a suitcase; a "cocaine press"; and a date book whose front page read "Truck and Auto Motor Co", "658 Griffith Rd. Suite 115, Charlotte, NC 28217." Meanwhile, at Amarillo Drive, agents arrested the driver of the white

6

van, Sandoval-Godoy. Agents then received a search warrant for the Amarillo Drive address and found approximately 1,074 pounds of marijuana, a Beretta 9mm handgun, and 2 kilograms of cocaine.

## II. DISCUSSION

At the hearing, both parties agreed that the only issue for decision was whether probable cause existed to support the government's warrantless arrest of Mr. Sandoval-Uriel. Consistent with the Fourth Amendment, a warrantless arrest is only permitted when there is probable cause to support a belief that a felony is being or has been committed by the individual arrested based on the totality of the circumstances. Maryland v. Pringle, 540 U.S. 366, 124 S.Ct 795, 799 (2003). If probable cause is lacking, the evidence seized as a result of his arrest should be suppressed. United States v. Al-Talib, 55 F.3d 923, 931 (1955). "Probable cause exists when there are facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 32, 37 (1979). Accordingly, the undersigned will only assess the facts known to agents at the time of Defendant's arrest.

Defendant claims that "law enforcement and government officials" arrested Defendant with "little more than an 'inchoate and unparticularlized suspicion' that criminal behavior was afoot." (Document No. 90, p.6) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)). Defendant believes he was arrested merely on a "subjective hunch" that he was involved with criminal activity. (Document 90, p.7). Specifically, Defendant argues that the agents stopped and arrested him without even reasonable suspicion that he was involved in the alleged criminal behavior:

7

> Law enforcement and government officials stopped and arrested Defendant 1) with no tip from a reliable source that was corroborated by facts on the ground, 2) with no information from a reliable source or informant that Defendant was involved or engaged in criminal activity, 3) no contraband or weapons in plain view, 4) no violations of any traffics laws or safety statutes, 5) no wire taps, tape recordings or cell phone connections with any other co-defendant, 6) no connection to the crime scenes on Griffin Road, and 7) no connections to the contraband.

(Document No. 90, p.6).

This is a relatively close case, but the undersigned finds that agents had more than a "subjective hunch," and that the objective evidence establishes that agents had not only a reasonable suspicion, but probable cause, to arrest Defendant. To determine whether probable cause exists, courts look to the totality of the circumstances known to the officers at the time of the arrest. Gates, 462, U.S. at 230-31. The undersigned concedes that the majority of the 7 items Defendant references above do not exist in this case; however, the evidence presented during the hearing and contained in the briefs did clearly establish that Defendant had "a connection to the crime scene on Griffith Road." (Document No. 90, p.6). Additionally, the testimony regarding Defendant's counter-surveillance driving tactics aids the government's finding of probable cause that Defendant was connected or involved with the illegal activity. The undersigned finds the totality of the circumstances leading up to Defendant's arrest provides enough evidence to support probable cause.

**A. Defendant's Connections With the Illegal Activity**

The agents observed Sandoval-Uriel on three separate occasions interact with persons directly connected with the illegal activity. First, Defendant interacted with Guerra and Ayala, two persons heavily involved in the illegal activity. Specifically, on April 7, 2012, before the cultivating equipment reached Charlotte, Guerra was seen at 592 Griffith. Guerra and Ayala

were present and involved in the April 8, 2012 marijuana delivery to Charlotte and were present and involved in the shipment's movement on April 17, 2012 to Amarillo Drive. During the roughly two-week surveillance, the two were seen on multiple occasions at 592 Griffith and then at the body shop at 658 Griffith. Guerra and Ayala not only appeared to manage or watch the properties, but they rented the necessary equipment and bought necessary supplies, such as masks, to efficiently deal with the marijuana.

On April 13, 2012, Brewer and Bryant witnessed Guerra and Ayala park the white van beside a blue Camry at the Stonecrest parking lot. While the identity of the driver of the blue Camry was not known at that time, at the hearing, both Brewer and Bryant identified the Defendant in the courtroom as the same person driving the blue Camry on April 13, 2012. After Guerra and Ayala parked the white van beside the blue Camry, the two got into the blue Camry (as passengers) and the car proceeded to make a roundtrip drive, approximately 24 miles one way, from Charlotte to Monroe, for no apparent reason.[3] While the agents can provide no evidence as to the conversations held in the blue Camry, this occurrence creates the existence of an obvious relationship between the two out of state Texas residents, Guerra and Ayala, and the driver of the blue Camry. Additionally, Brewer and Bryant also testified that the Defendant in the courtroom was the driver of the blue Camry the night of April 13, 2012, who drove to and entered Skinnyz bar. This occurrence provides an additional connection between the Defendant and the blue Camry.

Next, it was known to agents before Defendant's arrest that the driver of the blue Camry was connected to Sandoval-Godoy; and that Sandoval-Godoy was connected to the illegal activity on Griffith Road. First, the blue Camry driven on April 13, 2012 was registered to

---

[3] The surveillance agents lost sight of the blue Camry for a short period of time, but for the majority of the time they did not witness the car make any stops or pick anything up.

Sandoval-Godoy. Presumably, Sandoval-Godoy knows Sandoval-Uriel (at the time the driver of the blue Camry) well enough to let him use his car. Next, on April 16, 2012, a white Camry was seen at the Griffith Road facilities; this is the same day that agents heard loud noises and smelled burning marijuana. Later that day, the driver of the white Camry took Guerra and Ayala from 658 Griffith to their hotel. The driver of the white Camry was later identified as Sandoval-Godoy. More importantly, Sandoval-Godoy later drove the white Camry to the Stonecrest parking lot, where he met with the driver of the blue Camry. While no officer was able to verify the identity of the driver of the blue Camry on that occasion, the connection between the blue Camry, Mr. Sandoval-Godoy and the illegal activity on Griffith Road is compelling.

Further critical interaction occurred between Defendant, Sandoval-Godoy, Guerra and Ayala on April 17, 2012. Agents watched Guerra and Ayala drive the white van into the 658 Griffith location and load something into the van. They then watched the van, driven by Sandoval-Godoy, leave the warehouse driving towards Amarillo Drive. Simultaneously, other agents tracking the driver of the blue Camry, witnessed the blue Camry leave the Allison Woods area, located in South Charlotte, and head to North Charlotte where he eventually parked at an "elderly home" off Mineral Springs Road, never exiting his car. Notably, Mineral Springs Road is the only connecting road to Amarillo Drive, where the white van was headed. When the white van passed the "elderly home" where Defendant was parked, Bryant witnessed Defendant in the blue Camry pull out behind the white van. While two agents' cars separated the white van from the blue Camry, Bryant saw Defendant slow down and indicate that he was turning left when the white van did, but then after hesitating and looking in his mirrors, he went straight instead. Myers and McDonald also testified that the blue Camry was following closely behind the white van on Mineral Springs Road.

The undersigned recognizes that "nearness to the place of the arrest of a co-conspirator or to the place of illegal activity is not sufficient to establish probable cause"; however, this is one of many factors that can contribute to the totality of circumstances that link Defendant to the illegal activity. United States v. Soto, 375 F.3d 1219 (10th Cir. 2004) (citing United States v. Springfield, 196 F.3d 1180, 1182 (10th Cir. 1999)). In Soto, the court found that "much more than simple proximity" existed; "there was no apparent reason for the blue truck to circle the parking lot and later park there except to conduct counter-surveillance." Soto, 375 F.3d at 1222. Similarly, Sandoval-Uriel's presence in North Charlotte for no apparent reason seems far from a coincidence: his residence was in South Charlotte; he waited in a parking lot without leaving his car or meeting with anyone; he left this parking lot right after the white van loaded with suspected marijuana passed; Guerra and Ayala drove the same white van to the Stonecrest parking lot to meet the blue Camry on April 13, 2012; the driver of the white van on April 17, 2012 was the registered owner of the blue Camry Defendant drove on April 13, 2012; and the driver of the white van on April 17, 2012 was the driver of the white Camry that met with the driver of the blue Camry the day before the arrest, April 16, 2012. This is not simply a case of "nearness" of a co-conspirator at the time of the arrest; there was a significant connection between Defendant and the men involved in the illegal activity taking place at Griffith Road and Amarillo Drive.

**B. Counter-Surveillance Driving**

The Fourth Circuit has previously found, and most federal circuits have acknowledged, that evidence of counter-surveillance driving is a factor in establishing probable cause. Al-Talib, 55 F.2d at 931; see e.g., United States v. Martinex-Molina, 64 F.3d 719, 729 (1st Cir. 1995); United States v. Torres-Ramos, 536 F.3d 542, 555-56 (6th Cir. 2008); United States v. Pazos,

993 F.2d 136 (7th Cir. 1993) (finding "the government can sustain a drug conspiracy conviction solely on evidence that defendant engaged in counter-surveillance during a drug transaction"); United States v. Payne, 119 F.3d 637, 642-43 (8th Cir. 1997); United States v. Hoyos, 892 F.2d 1287 (9th Cir. 1989) (finding probable cause was established by evidence of counter-surveillance driving and defendant's meeting in a parking lot with known drug traffickers); United States v. Soto, 375 F.3d 1219, 1222-23 (10th Cir. 2004).

Here, three out of the four agents testified at the hearing that the driver of the blue Camry, now identified as Sandoval-Uriel, engaged in counter-surveillance driving tactics. Brewer testified that "heat-runs" or counter-surveillance is understood by agents as the belief that the driver of a car is trying to evade police detection. Brewer testified that based on his years of experience and training, as well as participating in over 1,000 surveillance jobs, Defendant's driving style on April 13, 2012 was "indicative to trying to detect or evade law enforcement." He explained that when Defendant drove in "mild traffic" with Guerra and Ayala in his car on the way to Monroe, he would slow down and then speed up and would frequently change lanes. Brewer also stated that after Defendant left Skinnyz that evening, Defendant's unusual driving style made Brewer so uncomfortable, he dropped his surveillance.

Agent Myers also testified that after departing Skinnyz, Defendant used unusual driving techniques. Myers explained that when Defendant saw Myers' car pull behind him, he pulled to the curb; when Myers passed him, the driver of the blue Camry pulled out behind him. At this point, Myers signaled right at the stop sign, Defendant went left, and Myers decided not to continue surveillance. Agent McDonald testified that after leaving Skinnyz on April 13, 2012, Defendant took an unusual route back to the Allison Woods area and drove at "high rates" of speed, eventually escaping surveillance for a period of time.

Myers also testified that Defendant engaged in counter-surveillance techniques on April 17, 2012. Defendant left the Allison Woods area towards Mineral Springs Road and then "made a loop for no apparent reason" around the Tyvola Road area before exiting onto Interstate 77. He then went South on Interstate 485 to get onto Interstate 85 where he "coincidentally" ended up on the same street as Sandoval-Godoy. While this is not an exhaustive summary of the testimony regarding the counter-surveillance tactics agents witnessed, the undersigned finds that these specific instances support the agents' testimony regarding Defendant's use of counter-surveillance techniques. Additionally, the undersigned understands that there could be various reasons as to why Defendant drove in this manner; however, the undersigned finds that the agents' testimony and experience support their finding that Defendant engaged in counter-surveillance tactics.

### III. CONCLUSION

The undersigned finds based on the totality of the circumstances that the agents had probable cause to arrest Sandoval-Uriel. The evidence in support includes, but is not limited to: the information agents obtained during their two week, 24 hour surveillance of the illegal activity at Griffith Road; the Defendant's interaction with Guerra and Ayala, the two men managing the illegal activity on Griffith Road; the Defendant's connection with Sandoval-Godoy, the owner of the blue Camry, which Defendant was seen driving on at least two occasions; the Defendant's proximity to the white van suspected of moving marijuana, as well as his driving tactics on April 17, 2012; and the Defendant's use of counter-surveillance driving tactics.

### IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion To Suppress Evidence; Supporting Memorandum Of Law" (Document

13

No. 90) be **DENIED**.

## TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

**IT IS SO RECOMMENDED**.

Signed: June 13, 2013

David C. Keesler
United States Magistrate Judge