UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:12-cr-00139-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | ORDER |
| CARLOS EDGAR SANDOVAL-URIEL ) | |
| ) | |
| Defendant. ) | |
| ) | |

THIS MATTER is before the Court on Defendant's Objections to the Magistrate Judge's Memorandum and Recommendation ("M&R"). (Doc. No. 237). The M&R (Doc. No. 232) recommended that Defendant's motion to suppress (Doc. No. 90) be DENIED. Defendant timely filed objections to the M&R, and the Court conducted two hearings on the objections. Following the second hearing on October 29, 2013, the Court issued an oral ruling denying the motion to suppress.[1] This memo follows. For the reasons that follow, the Court ACCEPTS AND ADOPTS the M&R as modified herein and DENIES Defendant's Motion to Suppress.

## I. BACKGROUND AND FINDINGS OF FACT

As an initial matter, the Court notes that Defendant objects to a number of findings of fact contained in the M&R. These numerous objections all center around one argument, specifically, that no probable cause existed for Defendant's warrantless arrest. The parties agree that the probable cause determination can include only those facts known to agents before or at the time of Defendant's arrest. The gravamen of Defendant's arguments concerning the M&R's

---

[1] Defendant subsequently entered a plea agreement with the Government on October 31, 2013 (Doc. No. 277), and his guilty plea was entered and accepted on November 1, 2013 (Doc. No. 279).

1

findings of fact is that they are irrelevant and not proper to consider in determining the issue of probable cause. Notably, the majority of the disputed findings of fact were included in the M&R for purposes of background, and during the hearing, the Magistrate Judge specifically stated on the record that post-arrest facts were admissible for the limited purpose of providing context to the witnesses' testimony and not for purposes of determining probable cause. Nevertheless, without deciding the merits of Defendant's objections, the Court adopts and incorporates by reference the summary of facts set forth in the M&R for purposes of providing background information only. For purposes of clarity of the discussion to follow and to ensure that the probable cause determination is solely based on information known prior to or at Defendant's arrest, the Court briefly summarizes the relevant facts as found in the M&R.

Relevant to Defendant's Motion to Suppress, the Court finds the following based on evidence known to agents before or prior to Defendant's arrest:

On April 2, 2012, Customs and Border Protection agents stopped a truck hauling three large pieces of agricultural equipment at the Laredo, Texas, border crossing. The use of X-ray equipment, drilling tools, and a narcotics detection dog led to the discovery of an enormous amount of marijuana hidden inside the equipment. Law enforcement proceeded with a "controlled delivery" to identify other suspects involved in a conspiracy to distribute and possess with intent to distribute the more than 3,100 pounds of marijuana that was brought over the United States – Mexico border in large farming equipment. (See Tr. 4/24/13, p. 38; see also Doc. No. 237-2, p. 18).

On April 3, 2012, a consensually-monitored phone call was made through the shipping company based on the bill of lading. This call confirmed that the load was to be delivered to

592 Griffith Road, Charlotte, North Carolina ("592 Griffith"). On April 6, 2012, Homeland Security Investigations ("HSI") agents escorted the truck carrying the cultivating equipment and marijuana to Charlotte, arriving on April 8, 2012.

Beginning on April 3, 2012, and continuing until Defendant's arrest on April 17, 2012, agents maintained 24-hour surveillance of 592 Griffith. On April 8, 2012, agents first saw Victor Guerra ("Guerra") at 592 Griffith. On April 9, 2012, with the aid of HSI agents, the farming equipment containing marijuana was delivered to Guerra and Paul Ayala ("Ayala") at 592 Griffith. The agents then saw Guerra and Ayala leave the area in a 2003 white, Ford Econoline van ("white van") with North Carolina license plate AKX6371. From the delivery date on April 9, 2012, through April 17, 2012, Guerra and Ayala made multiple trips in the white van from 592 Griffith to their hotel, the La Casa Inn, at 7900 Nations Ford Road.[2] At various times, agents witnessed Guerra locking and unlocking the door at 592 Griffith. On April 13, 2012, Guerra and Ayala rented a piece of heavy moving equipment that was dropped off at 592 Griffith, and Guerra parked a large flatbed truck at 592 Griffith.

On the afternoon of April 13, 2012, Guerra and Ayala drove the white van to Stonecrest Shopping Center ("Stonecrest"), where they parked beside a blue Toyota Camry ("blue Camry"). Based on information from the license tag and registration, agents learned the blue Camry was registered to Jose Luis Sandoval-Godoy ("Sandoval-Godoy"). Three different law enforcement officers involved in the surveillance that day testified at the hearing on the motion to suppress to the events that took place next.

---

[2] It is important to note that both Guerra and Ayala were identified by agents prior to Defendant's arrest. In addition, both men had Texas driver's licenses. This was known to agents prior to Defendant's arrest because in an unrelated matter at the hotel where Guerra and Ayala were staying, Guerra and Ayala provided law enforcement officers with their Texas biographical information as well as with their cell phone numbers, which had Texas area codes.

3

HSI task force officer Brandon Brewer ("Brewer") testified that he was parked directly in front of the blue Camry in the Stonecrest parking lot, with the front of his car facing directly toward the front of the blue Camry. Brewer testified he observed the driver of the vehicle, which was parked "nose to nose" and no more than 100 feet away from him. (Tr. 5/16/13, p. 9; Doc. No. 233, p. 9). Brewer and other agents in the surrounding area, including HSI agent Glen MacDonald, who also testified at the suppression hearing, witnessed Guerra and Ayala get into the blue Camry (as passengers), drive out of the Stonecrest parking lot, and proceed to drive approximately 24 miles one way to Monroe, North Carolina, and then 24 miles back to the Stonecrest shopping center. Brewer stated that the blue Camry driver's driving techniques were indicative of someone trying to "detect or evade law enforcement." (Tr. Hearing, 5/16/13; Doc. No. 233, p. 13.) Officer Brewer stated that the driver would frequently increase and decrease his speed and change lanes "more than what I would consider a normal person would . . . make lane changes." (Tr. Hearing, 5/16/13; Doc. No. 233, p. 53.) On cross-examination, Brewer acknowledged that other reasons, aside from counter-surveillance, could exist to explain this driving behavior. (Tr. Hearing, 5/16/13; Doc. No. 233, p. 42.) When the court sought clarification from Brewer's testimony, Brewer agreed that the driver's driving "was unusual, even given that [it's] a fairly congested area." (Tr. Hearing, 5/16/13; Doc. No. 233, p. 56.) Detective Brad Meyers, with the Huntersville Police Department, joined the surveillance of the blue Camry after Guerra and Ayala had entered the vehicle at Stonecrest and observed this unusual driving behavior.

At one point, the ground agents lost the blue Camry for a short time as the car arrived in the Monroe area. Brewer testified the blue Camry was out of sight "approximately two, three

4

minutes." (Tr. 5/16/13, p. 15; Doc. No. 233, p. 15.) An HSI Special Agent, who did not testify at the hearing, conducted air surveillance in a small airplane. As part of the surveillance, the air surveillance provided regular updates via radio communications as to the blue Camry's location. After a short time, Brewer and the other ground agents "picked up" the blue Camry as it came back on the highway. (Tr. 5/16/13, p. 15; Doc. No. 233, p. 15.)

The blue Camry returned to Stonecrest and dropped Guerra and Ayala off, and the blue Camry immediately proceeded to a park off Johnston Road in Charlotte, where the driver exited the vehicle. Agent McDonald observed the driver exit the vehicle, leave for a short time (presumably going for a jog), return to the parking area, visit the restroom, and then get back into the driver's seat in the blue Camry. Afterward, agents followed the blue Camry to Providence Road, where the driver made a turn onto Allison Woods Drive and then a left onto Allison Lane (both herein referred to as the "Allison Woods area"). Upon entering the Allison Woods area, Brewer stated that the driver would speed up and slow down, which Brewer, based on his training and experience, considered to be a common counter-surveillance tactic to prevent law enforcement from locating his residence. (Tr. Hearing, 5/16/13; Doc. No. 233, p. 21.) In this area, Brewer and other agents lost sight of the driver of the blue Camry. From April 13, 2012, through Defendant's arrest on April 17, 2012, agents never identified the specific residence of the blue Camry's driver.[3]

On April 13, 2012, after an hour to two hours of waiting for the blue Camry to re-appear, law enforcement officers observed the blue Camry leaving the Allison Woods area.

---

[3] Although not considered below in the Court's determination of probable cause, the Court notes for the record that after Defendant's arrest, agents identified Defendant's residence as 12140 Red Rest Lane, Charlotte, which is accessed from the Allison Woods area.

MacDonald, Myers, and Brewer followed the driver to "Skinnyz Bar and Grill" ("Skinnyz"), located in Matthews, North Carolina. MacDonald and Brewer observed the driver exit the vehicle, meet another individual in the parking lot, and proceed inside Skinnyz with the individual he met in the parking lot. MacDonald testified this was the same person he had observed going for a jog at the park after the drive from Stonecrest to Monroe and back. (Tr. 4/24/13, p. 90; Doc. No. 237-5. P. 10). Agent MacDonald instructed Brewer and Myers to go inside the bar in an undercover capacity. Inside Skinnyz, Brewer surreptitiously took a picture of the driver of the blue Camry, as well as a photograph of the person the driver met with inside the bar. Brewer testified at the hearing that the person in the picture, identified as Exhibit 6 at the hearing, is the same person who was driving the blue Camry at Stonecrest on April 13, 2012, and he testified that this was the same person sitting in the courtroom, Defendant Sandoval-Uriel.[4]

In an attempt to locate where the driver of the blue Camry lived, Brewer left the bar before Defendant and went back to the Allison Woods area. When Brewer saw the blue Camry return to the area, Brewer turned and followed behind the blue Camry, which made numerous turns. Due to the "counter-surveillance" driving tactics employed by the blue Camry's driver, Brewer testified that he "did not feel comfortable" and stopped following the car. (Tr. Hearing, 5/16/13; Doc. No. 233, p. 28.)

Myers also testified to the unusual nature of the blue Camry's movements. He stated that when the driver of the blue Camry appeared to notice a car following him, the driver

---

[4] Myers also testified that the driver of the blue Camry on April 13, 2012, was the same driver that appeared at Skinnyz and identified Defendant Sandoval-Uriel in court as the same person seen in the Camry on April 13, 2012. Both Brewer and Myers testified that they did not know the driver's name until after Defendant was arrested.

pulled to the curb; and when Myers passed him, the blue Camry pulled out behind Myers. At that point, Myers signaled right at the stop sign, and the blue Camry proceeded left. This was the last Myers saw of the blue Camry on April 13, 2012.

MacDonald testified that on April 16, 2012, officers working on the surveillance team witnessed Guerra and Ayala move one of the pieces of the marijuana-containing cultivating equipment from 592 Griffith to 658 Griffith Road, Suite 115, Charlotte, North Carolina ("658 Griffith"). 658 Griffith appeared to be an auto body shop. The equipment was later pulled inside the shop, and the door closed. Later that day, two individuals entered 658 Griffith with welding equipment. Agents then entered an establishment beside the adjoining shop and heard loud sounds and smelled burning marijuana. Persons at the business beside the shop also complained to the agents of the "strong smell" of burning marijuana. (See Tr. 4/24/13, p. 66; see also Doc. No. 237-4, p. 6). Agents observed these four men get into a white Toyota Camry ("white Camry") at 658 Griffith the day the equipment was moved, burning marijuana was smelled, and the loud noises were heard. That evening, the white Camry (with an unknown driver) drove Guerra, Ayala and two other men from Griffith Road to the hotel where they had been staying. The white van previously driven by Guerra and Ayala was also parked at one of the hotels where the two other men from Griffith Road were staying. After dropping off the four individuals, the white Camry left the premises, and agents continued to follow it.[5] (Tr. 4/24/13, p. 67; see also Doc. No. 237-4, p. 7).

---

[5] Based on a photograph taken of the driver during this surveillance, agents identified the driver of the white Camry as Sandoval-Godoy. (Id.) The testimony is unclear as to whether the identification of the driver by name as Sandoval-Godoy occurred prior to or after arrest. (Compare Tr. 4/24/13, p. 67 with Tr. 4/24/13, p. 94). Nevertheless, taking the evidence in the light most favorable to Defendant, the Court will consider the driver (or potential drivers) of the white Camry to be unidentified until after arrest.

7

Also, later on April 16, 2012, agents saw the driver of the blue Camry meet with the driver of the white Camry at Stonecrest parking lot. Agents could not identify the driver of the blue Camry at that time. Agents confirmed the white Camry was the same vehicle previously observed by agents. (Tr. 4/24/13, p. 69; see also 237-4, p. 9).

On the morning of April 17, 2012, Myers witnessed the blue Camry leave the Allison Woods area and turn right onto Providence Road and head towards Interstate 485. Myers was travelling in the area attempting to locate the blue Camry within the subdivision when the blue Camry "came right pas[t] me on that day." (Tr. 5/16/13, p.73; Doc. No. 233, p. 73.) Myers testified he could see the driver: "Clearly I was able to see him inside the vehicle. Mr. Uriel inside the vehicle. And I remembered him from the day we was [sic] in the bar." (Tr. 5/16/13, p.73; Doc. No. 233, p. 73.) Myers began to follow the vehicle. Myers witnessed the driver make a "long loop" around the Tyvola Road/Nations Ford Road area for no apparent reason, and then continue onto Interstate 77 towards North Charlotte. (Tr. Hearing, 5/16/13; Doc. No. 233, p. 75.) HSI Special Agent James Bryant ("Bryant"), who was parked off Mineral Springs Road, witnessed the driver of the blue Camry drive down Mineral Springs Road and pull into the parking lot of an "elderly home," never getting out of his car. (Tr. Hearing, 5/16/13; Doc. No. 233, p. 94.)

Also on the morning of April 17, 2012, agents witnessed the white van drive into a business bay door at 658 Griffith; the door then closed. Later that morning, the door opened back up, and the van drove away from 658 Griffith. Agents observed the white Camry that had been seen on April 16 follow the white van as it left. (Tr. 4/24/13, p. 71; see also 237-4, p. 11). Agents communicated via radio to agents, including Myers, that the white van was leaving the

8

warehouse area.[6] (Tr. 5/16/13, p. 85). The white Camry ceased following the white van at some point before the van approached an area near Mineral Springs Road.

Agent Bryant witnessed the blue Camry pull back onto Mineral Springs Road after the white van passed the "elderly home" (two agents in vehicles separated the white van and the blue Camry). When the white van slowed to turn left onto Amarillo Drive, the agents also turned left to follow, and the blue Camry continued straight down Mineral Springs Road. Bryant testified that before the blue Camry continued straight, the blue Camry braked, "indicated that he was turning left," appeared "hesitant," and looked in the rear view and side mirrors several times. (Tr. Hearing, 5/16/13; Doc. No. 233, pp. 97-98.) Myers also witnessed the blue Camry following two cars behind the white van brake when the van turned left, but then continue down Mineral Springs Road. Myers and Bryant followed the blue Camry, stopped the vehicle, and arrested the driver.

Agent MacDonald testified that based on these events that took place on April 16 and April 17, agents believed the occupants of 658 Griffith were cutting into the agricultural equipment to remove the marijuana. (Tr. 4/24/13, p. 79; see also 237-4, p. 19). This belief was based on the welding truck driven into the bay, the shutting of the door, the loud noises coming from inside, and the complaints from other tenants about the smell of burning marijuana. Agents observed the occupants leave that evening in the white Camry and return the next day, when more loud noises were heard. The welding truck was backed out of the bay, the white van driven inside, and the door again shut. Once the door opened, the van

---

[6] The white van headed to 7136 Amarillo Drive, Charlotte, North Carolina ("Amarillo Drive"). Amarillo Drive can only be accessed by car from Mineral Springs Road. The fact this location was later revealed as a marijuana stash house is of no bearing on the probable cause determination because this fact was unknown at the time of Defendant's arrest.

9

exited the building and drove away, followed by the white Camry. MacDonald believed the vehicle following in tandem indicated counter surveillance and security for the load in the white van. (Tr. 4/24/13, p. 80; see also 237-4, p. 20).

Bryant testified that after this series of events, he was told to stop and arrest the driver of the blue Camry, now identified as Defendant Sandoval-Uriel, which Bryant and Myers did. Incident to arrest, agents seized a receipt for cans of paint found in the body shop at 658 Griffith, a business card listing Defendant as sales representative for "Truck & Auto Motor Company," the name of the shop located at 658 Griffith, and a garage door opener. The agents later used the garage door opener to locate Defendant's house and to seize certain belongings inside, including: a money counter; $192,730 in U.S. Currency in a suitcase; a "cocaine press;" and a date book whose front page read "Truck and Auto Motor Co." "658 Griffith Rd. Suite 115, Charlotte, NC 28217." Meanwhile, at Amarillo Drive, agents arrested the driver of the white van, Sandoval-Godoy. Agents then received a search warrant for the Amarillo Drive address and found approximately 1,074 pounds of marijuana, a Beretta 9mm handgun, and 2 kilograms of cocaine.

## II. ANALYSIS

The parties agree the sole issue raised in the motion to suppress (and the objections to the M&R on the motion to suppress) is whether probable cause existed to support the warrantless arrest of Defendant. Following receipt of testimony, other evidence, and argument, the M&R concluded probable cause existed to support Defendant's warrantless arrest. Generally, Defendant objects to the conclusion that probable cause existed, arguing that

the M&R improperly comingled facts known to law enforcement prior to Defendant's arrest with facts discovered after Defendant's arrest. Defendant has submitted thirty-two (32) objections to the M&R. Without delineating each individual objection, the Court summarizes the objections in the following groups: (1) whether the M&R improperly considered facts and information obtained *after* Defendant's arrest in determining the existence of probable cause; and (2) whether the M&R's conclusion of law that probable cause existed is supported by facts and information known to the officers prior to or at the time of Defendant's arrest. The Court addresses these in turn.

A district court may refer a motion to suppress to a magistrate judge for a recommendation pursuant to Federal Rule of Criminal Procedure 59(b)(1). If a party timely files "specific written objections" to the proposed recommendations, the "district judge must consider de novo any objection to the magistrate judge's recommendation." Fed.R.Crim.P. 59(b)(3); see also 28 U.S.C. § 636. The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

It is well-settled that a warrantless arrest "requires that the arresting officers possess probable cause to believe that the person has committed or is committing a felony offense." United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995) (citing United States v. Watson, 423 U.S. 411, 422 (1976)). The Supreme Court has explained:

> The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection. On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

Maryland v. Pringle, 540 U.S. 366, 370-71 (2003) (internal quotations and citations omitted). In cases questioning probable cause to make a warrantless arrest, the Court must consider "the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause . . . ." Pringle, 540 U.S. at 371 (quotation and citation omitted). "To determine whether probable cause existed, courts look to the totality of the circumstances known to the officers at the time of the arrest." United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995) (citing Illinois v. Gates, 462 U.S. 213, 230–31 (1983)). "Moreover, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" United States v. Trappier, 447 F. App'x 463, 465 (4th Cir. 2011) (quoting United States v. Johnson, 599 F.3d 339, 343 (4th Cir.) (internal quotation marks and citation omitted), cert. denied, ––– U.S. –––, 131 S.Ct. 358, 178 L.Ed.2d 232 (2010)). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998)

(citing Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)).

A. Facts and Evidence Obtained After the Arrest

As previously noted, the bulk of Defendant's objections relate to the M&R's alleged consideration of facts unknown the officers before or at the time of Defendant's arrest. Defendant argues these facts could not provide a basis for probable cause because they were discovered after the arrest. While Defendant's legal premise is true, the facts challenged by Defendant in his objections were not considered in evaluating probable cause and were explicitly excluded in the assessment of the facts surrounding probable cause. (Doc. No. 232, p. 7). As noted above, both at the hearing and in the written order following the hearing, the magistrate judge explicitly excluded consideration of facts and evidence discovered after Defendant's arrest in assessing probable cause. During the hearing, the magistrate judge stated:

> All right. I want to try to be very disciplined about not commingling stuff that was not known with stuff that was. I think the defense attorneys make an excellent point in that regard. . . . It's important that we not muddy the record with information that was not known to law enforcement at the time they arrested the defendant.

Tr. 4/24/13, p. 53; Doc. No. 232-3; see also M&R, Doc. No. 232, p. 7 ("Accordingly, the undersigned will only assess the facts known to agents at the time of Defendant's arrest.").

Even presuming Defendant's objections to the findings had merit, the Court has reviewed the transcript from the entire hearing on the motion to suppress and set forth the findings of fact above based only on information known by law enforcement before or at the time of Defendant's arrest. To the extent they exclude findings by the magistrate that included knowledge obtained after Defendant's arrest, the Court hereby modifies those findings of fact as stated herein.

13

Accordingly, Defendant's objections as to the consideration of information learned by the agents after Defendant's arrest are overruled.

B. Probable Cause

The remaining objections generally relate to whether the facts support a finding of probable cause to conduct a warrantless arrest. The M&R concluded that Defendant's connections with the illegal activity and the observation of counter-surveillance driving supports a finding of probable cause. In addressing Defendant's objections as to these conclusions, the Court conducts a *de novo* review.

> Under the collective knowledge doctrine, the collective knowledge of the police can be used in two different situations to establish probable cause even when the arresting officer himself does not have sufficient personal knowledge to independently establish probable cause. The first situation arises when one officer with personal knowledge of facts sufficient to establish probable cause orders another officer, who does not have personal knowledge of those facts, to make an arrest. In that situation, it is clear that "so long as the officer who orders an arrest . . . has knowledge of facts establishing probable cause, it is not necessary for the officers actually making the arrest . . . to be personally aware of those facts." United States v. Laughman, 618 F.2d 1067, 1072-73 (4th Cir.1980). In the second situation, an officer without independent knowledge of facts sufficient to establish probable cause makes an arrest, but the officer has been in communication with a group of officers that collectively has knowledge of facts sufficient to establish probable cause. "[W]hen a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." Laughman, 618 F.2d at 1072 n. 3. (quoting United States v. Woods, 544 F.2d 242, 260 (6th Cir.1976); see also United States v. Wells, 98 F.3d 808, 810 (4th Cir.1996)) ("[A]lthough the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that [the defendant had committed a crime], it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure.").

United States v. Joy, 336 F. App'x 337, 342 (4th Cir. 2009).

The Court has already set forth the uncontested facts (based on agents' knowledge prior to or at the time of Defendant's arrest) above tending to show that HSI agents and local law enforcement working together conducted a controlled delivery of a large quantity of marijuana hidden in agricultural equipment to Guerra and Ayala at 592 Griffith and subsequently conducted surveillance on the premises and persons associated with the premises.

In sum, these facts, show that over the course of four days, agents observed a driver of blue Camry: (1) meet in the Stonecrest shopping center parking lot with Guerra and Ayala (two men known to be associated with the delivery of a large quantity of marijuana and who had arrived for the meeting in a white van); (2) drive a forty-eight mile round trip with Guerra and Ayala, apparently without stopping; (3) meet in the same Stonecrest parking lot with the driver of the white Camry after the white Camry had picked up Guerra, Ayala, and the other men from 658 Griffith and dropped them off at their hotel; and (4) drive several miles across town to a parking lot of an elderly care facility, wait in the car (never exiting the vehicle), and then suddenly exit the parking lot at the same time the white van driven by Guerra and Ayala (and believed to be transporting marijuana) passed by. This conduct is sufficient to indicate the blue Camry was connected to Guerra, Ayala, and the white van.

Further, the facts indicate a close relationship, beyond mere coincidence, between the driver of the blue Camry and the ongoing drug activity. Officers knew Guerra and Ayala had accepted delivery of agriculture equipment containing a substantially large amount of marijuana. On April 16 (the day after agents observed the blue Camry meet with and drive Guerra and Ayala to Monroe and back, and on the same day the blue Camry met with the white Camry, which had also been associated with transporting Guerra and Ayala) and the next day,

April 17, law enforcement agents observed Guerra and Ayala: (1) move a piece of the agriculture equipment that agents knew contained marijuana from one warehouse at 592 Griffith to a nearby warehouse at 658 Griffith; (2) engage in loud activity inside the warehouse (with the assistance of other individuals bearing welding instruments) that resulted in the smell of burnt marijuana; and (3) drive the white van into and out of the warehouse, closing the door for a period of time sufficient to load the van. Once the white van drove away from 658 Griffith, it drove for some time across town towards the location of the parked blue Camry. As the van passed, the blue Camry suddenly exited the parking lot and followed the van. These facts, together with the blue Camry's direct interaction on multiple occasions with Guerra and Ayala, are reasonably indicative that the driver of the blue Camry was involved in the ongoing, illegal drug activity being conducted by Guerra and Ayala.

Finally, the agents collectively confirmed on multiple occasions that the driver of the blue Camry was the same person on almost every occasion the agents observed the car. On April 13, Brewer testified he observed the driver of the blue Camry as Guerra and Ayala entered the vehicle at Stonecrest and before the three men drove off together towards Monroe. During the hearing on the motion to suppress, Brewer identified Defendant as the blue Camry's driver he observed in the parking lot. Immediately after the drive to Monroe and back, Agent MacDonald observed the driver exit the blue Camry and go for a run. During the hearing on the motion at bar, MacDonald identified Defendant as the driver. Later that evening, MacDonald and Brewer observed the driver of the blue Camry arrive at Skinnyz and enter the bar with another man. MacDonald testified at the hearing that the blue Camry's driver was the same man he had observed exit the blue Camry and go for a run earlier in the day.

Additionally, during the hearing, Brewer identified Defendant as the man who had driven the blue Camry to Skinnyz. Brewer also observed the driver inside the bar and took a photograph of him. Myers (who had entered Skinnyz with Brewer) also identified Defendant during the hearing as the person he observed inside Skinnyz. On April 17, Myers observed the driver of the blue Camry leaving the Allison Woods area and testified at the hearing on the instant motion that the driver was the same individual he had seen at Skinnyz on April 13. Myers followed the blue Camry until he assisted in the arrest of Defendant.

Moreover, other facts, when taken together as a whole, indicate that it was reasonable to believe the driver was the same: (1) the driver frequently engaged in counter-surveillance driving techniques; and (2) the driver left and returned to the Allison Woods residential neighborhood area on several occasions, including the day the blue Camry met with Guerra and Ayala at the shopping center and went for a long drive (April 13), as well as the day the blue Camry appeared to wait on and follow the white van (April 17), which suggests this was the residential area where the driver lived.

In sum, the totality of the circumstances, viewed from the standpoint of an objectively reasonable police officer and based solely on information known to the officers prior to or at the time of Defendant's arrest, support a finding of probable cause that the driver of the blue Camry as identified by agents was committing a felony offense.

Furthermore, the counter-surveillance driving observed by the agents further bolsters the existence of probable cause. In Al-Talib, a case strikingly similar to the case at bar, the Fourth Circuit upheld the district court's finding of probable cause to support a warrantless arrest and relied, in part, on counter-surveillance as a factor supporting the probable cause.

> Here, the DEA had probable cause to arrest Basher. For two days, DEA agents watched Basher travel around Virginia with Munoz and Avilez in an obvious attempt to obtain the marijuana, going to Tankersley's motel, the hospital, and the car depot. Basher was serving as the driver throughout this period. Agents also observed him engage in what they perceived to be counter-surveillance driving tactics. For example, Basher made u-turns to check for tails, and drove around to the back of Redman's in an attempt to keep a low profile. An officer could have reasonably inferred that Basher was engaged in committing a felony. Probable cause has often been upheld in similar circumstances. See, e.g., United States v. Clark, 754 F.2d 789, 791–92 (8th Cir.1985). The district court properly denied Basher's motion to suppress.

Al-Talib, 55 F.3d at 931. Numerous other circuits have approved the consideration of evidence of counter-surveillance driving as a factor in establishing probable cause. See United States v. Martinex-Molina, 64 F.3d 719, 729 (1st Cir. 1995); United States v. Torres-Ramos, 536 F.3d 542, 555-56 (6th Cir. 2008); United States v. Pazos, 993 F.2d 136 (7th Cir. 1993) (finding "the government can sustain a drug conspiracy conviction solely on evidence that defendant engaged in counter-surveillance during a drug transaction"); United States v. Payne, 119 F.3d 637, 642-43 (8th Cir. 1997); United States v. Hoyos, 892 F.2d 1287 (9th Cir. 1989) (finding probable cause was established by evidence of counter-surveillance driving and defendant's meeting in a parking lot with known drug traffickers); United States v. Soto, 375 F.3d 1219, 1222-23 (10th Cir. 2004).

Therefore, the Court overrules Defendant's objections to the M&R, finds that probable cause existed to arrest Defendant without a warrant, and modifies the M&R as explained herein.

### III. CONCLUSION

Based on the totality of the circumstances and the facts known to law enforcement at the time of Defendant's arrest, it was reasonable for the officers to infer a common enterprise

among Guerra, Ayala, and the driver of the blue Camry. The agents had more than a subjective hunch or bare suspicion. Accordingly, the evidence establishes that the agents had probable cause to arrest Defendant as the driver of the blue Camry.

IT IS THEREFORE ORDERED that the M&R is ACCEPTED AND ADOPTED as modified herein and Defendant's Motion to Suppress is DENIED.

IT IS ORDERED.

Signed: November 6, 2013

Frank D. Whitney
Chief United States District Judge